United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RALPH I. MILLER, an individual, and as Successor-in-Interest to Best-of-China.Com, Inc., a California corporation,

Plaintiff,

vs.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

Defendant.

_______________________________________/

No.C02-2118 MJJ

**ORDER RE IBM'S MOTION FOR SUMMARY JUDGMENT**

Pending before the Court is Defendant International Business Machines Corporation's ("IBM") Motion for Summary Judgment (Doc. #485). Plaintiff Ralph Miller has filed an Opposition (Doc. #570), to which IBM filed a Reply (Doc. #593). For the following reasons, the Court **GRANTS** IBM's Motion. I. Background

This case centers on the aftermath of Best-of-China.Com's ("BCC") attempt to establish a web portal and e-commerce site for Internet users in China. Toward this end, in 1999, BCC contracted with IBM World Trade Corporation ("WTC"), IBM China, and IBM Engineering Technology (Shanghai) Co., Ltd. ("ETC"), for the provision of consulting services, software, and hardware to establish the web portal. However, the portal project failed, prompting Mr. Miller to initiate this lawsuit in April 2002. He charges that the equipment the defendants provided was substandard and inadequate for the requirements of its intended use, and that IBM and its subsidiaries impermissibly accessed BCC's computers, causing them to be disabled and damaged. As a result of this conduct, Mr. Miller alleges

that he was deprived of the fruits of BCC's tangible and intellectual property, business opportunities and investments, salary and other compensation; denied the opportunity to recoup substantial capital investments that he made in BCC; and suffered other direct monetary losses, loss of business opportunities, and good will. (Sec. Am. Compl. ¶20.) In his Second Amended Complaint, Mr. Miller asserts claims for: (1) breach of various contracts relating to the portal project; (2) conversion; (3) trespass; (4) fraud in the inducement; (5) fraud/intentional misrepresentation; (6) negligence/negligent misrepresentation; (7) fraud/active concealment of known facts; (8) breach of express and implied warranties of fitness; and (9) fraud and related activity in connection with computers in violation of 18 U.S.C. §1030.

After four years of highly-contentious litigation, IBM now moves for summary judgment on all of Mr. Miller's claims.

II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *See id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

United States District Court
For the Northern District of California

*Id.* at 249-50 (internal citations omitted).

III. Discussion

A. Factual Background

In the late 1990's, BCC wanted to establish a web portal site in China to provide news, information, products, and services over the internet to consumers in China. Mr. Miller was BCC's chairman and chief executive officer from its founding until its dissolution in May 2002. In late 1999 and early 2000, BCC contacted ETC about providing software development services, and supplying computer hardware and products to BCC for manufacture and delivery in China.

BCC ultimately executed a series of agreements in connection with the web portal project. On December 31, 1999, BCC and IBM WTC executed a Stock Subscription Agreement, through which WTC obtained shares of BCC stock. On January 16, 2000, BCC and ETC executed a Services Agreement, wherein the parties agreed that ETC would provide certain services and that BCC would pay the charges set forth in the Statement of Work ("SOW"). The Services Agreement also provided that ETC's responsibilities were conditioned on BCC's fulfilment of the SOW. In January 2000, BCC and ETC also executed the SOW. The SOW stated that BCC would make payments based on task performance and that BCC would pay within 30 days of receipt of an invoice. On October 2, 2000, BCC and IBM executed an Amended and Restated Subscription to Corporate Stock Agreement, which superseded the Stock Subscription Agreement. Pursuant to the Amended Agreement, IBM was substituted *ab initio* for WTC as the subscriber of BCC's stock. The Amended Agreement further provided that full consideration for these shares was "received as of December 31, 1999," and "received as of June 30, 2000."

In accordance with these agreements, ETC and IBM China began performing software development services for BCC. Subsequently, BCC began to experience difficulties with funding. ETC sent BCC invoices for the services it provided, but BCC failed to pay. According to Mr. Miller, BCC planned to pay the amounts due when BCC's received its "B round" of funding. ETC and IBM China never agreed to defer being paid until BCC obtained additional funding.

After BCC failed to make its payments and owed ETC and IBM China over $1 million, ETC and IBM China terminated their services. IBM asserts that because BCC had not paid ETC or IBM China

for their software services, ETC and IBM China removed the software from BCC's server before returning it to BCC in the United States.

BCC was dissolved on May 15, 2002. Mr. Miller claims that before the dissolution, on October 31, 2001, BCC's Board passed a "Closing Resolution," stating that BCC "assign[ed] all right, title and interest in and to the property of [BCC] (including all intellectual property and contract interest rights)" to Mr. Miller. Thereafter, on April 30, 2002, Mr. Miller initiated this lawsuit, asserting claims for breach of contract, fraud, conversion, and trespass. IBM ow moves for summary judgment on all claims Mr. Miller has asserted against it.

B. IBM's Motion for Summary Judgment

1. Assignment

IBM first argues that it is entitled to summary judgment because Mr. Miller lacks standing to sue on BCC's behalf. According to IBM, Mr. Miller was not a party to any of the contracts between BCC and ETC and IBM China, and Mr. Miller's only evidence of the purported assignment - BCC's Closing Resolution - is insufficient to show that BCC validly assigned its rights to him.

Specifically, IBM asserts that the Closing Resolution did not effect a valid assignment for five reasons: (1) there is no competent evidence that the signatories were elected directors of BCC who had the authority to assign BCC's rights; (2) the purported assignment is not sufficiently clear to be a valid assignment and is subject to conditions precedent that were not fulfilled; (3) it is not an assignment, but merely an authorization for Mr. Miller to be a limited collection agent; (4) any purported assignment in the Closing Resolution is ineffective because it seeks to prefer certain creditors and avoid obligations to others; and (5) on its face, the Closing Resolution does not transfer any of BCC's obligations or liabilities, as required for any unconditional assignment.

First, IBM asserts that Mr. Miller has no evidence that Mr. Gallagher or Mr. Guthrie, two of the three signatories to the Closing Resolution, were elected directors of BCC, or that Mr. Miller, Mr. Gallagher, or Mr. Guthrie had authority to assign BCC's rights. Mr. Miller, however, has proffered Mr. Guthrie's Declaration, wherein he avers that he, Mr. Miller, and Mr. Gallagher, were members of BCC's Board; that the Board of Directors had authority to assign's BCC's rights in order to wind down the corporation's affairs; and that on October 31, 2001, the Board exercised this authority and assigned

BCC's rights to Mr. Miller, as memorialized by the Closing Resolution.[1] The Court finds this evidence sufficient to raise a triable issue of fact as to whether the signatories to the Closing Resolution were authorized to assign BCC's rights. Further, the Court rejects IBM's argument that, absent some corroborating documentary evidence, Plaintiff cannot establish a valid assignment by clear and positive evidence with Mr. Guthrie's statements alone.

Next, IBM advances that the language of the Closing Resolution is not sufficiently clear to be an effective assignment. Despite its charge that the language of the purported assignment lacks clarity, IBM fails to specify what language is ambiguous or was omitted. As set forth above, the Closing Resolution expressly states that the Board is irrevocably assigning all right, title, and interest in and to BCC's property to Mr. Miller. The Court finds no ambiguity in this language.

IBM also argues that there is no competent evidence that the conditions precedent in the Closing Resolution - namely, the procurement of insurance by Mr. Miller - were met. The Closing Resolution states:

> Conditional on a pro-rata share payment by the Directors below, Miller shall purchase "D&O Tail Insurance" covering the Company's operations through October 31, 2001, for a period of one (1) year, through October 31, 2002.

IBM claims that Mr. Miller failed to satisfy this condition. Mr. Miller, however, has submitted a Certificate of Liability Insurance, which he claims establishes that he did purchase D&O Tail Insurance. IBM counters that the document is not properly authenticated because Mr. Miller has no personal knowledge of it; that it is not properly before the Court because Mr. Miller failed to produce it during discovery; and that it does not provide insurance for the period required by the Closing Resolution - October 31, 2001 through October 31, 2002. Examining the Certificate, the document indicates that BCC had Directors & Officers Liability insurance coverage effective on October 30, 2000, and expiring on October 30, 2001. The Certificate also indicates: "The above D&O Policy includes election of the

---

[1]IBM moves to strike Mr. Guthrie's Declaration in accordance with Magistrate Judge James's Order, on the ground that Mr. Miller did not provide current contact information in a discovery response for Mr. Guthrie. (*See* Docs. #420 & #458.)

IBM also contends that, in any event, Mr. Guthrie's statements are insufficient because neither Mr. Guthrie or Mr. Miller has provided the Court with a BCC corporate document to substantiate the statements. IBM therefore asserts that Mr. Guthrie's statements fails to provide clear and positive evidence to prove an assignment under California law. The Court, however, rejects IBM's argument.

Optional Extension Period of 365 days (commonly known as Tail Coverage.)" If this language is construed to mean that BCC was insured under the D&O Tail Policy for 365 days after the expiration of the initial D&O Policy on October 30, 2001, Mr. Miller can show that he satisfied the condition in the Closing Resolution. Thus, there is a question of fact as to whether Mr. Miller procured D&O Tail insurance covering October 31, 2001 to October 31, 2002, in accordance with the Closing Resolution. Summary judgment in favor of IBM on this basis is therefore inappropriate.

Third, IBM contends that the Closing Resolution does not assign BCC's rights to Mr. Miller, but merely makes him a collection agent to wind up BCC's affairs. According to IBM, the Closing Resolution "required [Mr.] Miller to disburse all net proceeds from the exercise of the rights granted to satisfy employee claims, secured claims, unsecured claims, preferred shareholders, and common shareholders." The Court, however, is unpersuaded by IBM's argument. Even conceding that the Closing Resolution required Mr. Miller to disburse the net proceeds, this does not foreclose an assignment of BCC's rights. In fact, IBM acknowledges in its argument that Mr. Miller was to disperse all net proceeds *from the exercise of the rights granted*. Thus, in order to carry out the disbursement, BCC had to transfer its rights to enable Mr. Miller to exercise them. The Court therefore rejects IBM's argument that the Closing Resolution only made Mr. Miller a collection agent.

Fourth, IBM contends that the Closing Resolution improperly attempts to order BCC's liability and arbitrarily and unfairly excludes certain liabilities. Particularly, IBM contends that BCC owes ETC and IBM China over $1 million, but there is no provision in the Closing Resolution to pay either entity. IBM also argues that although Mr. Miller claims that IBM is a BCC shareholder, there is nothing in the Closing Resolution that purports to treat IBM the same way that Miller is required to treat other shareholders. IBM thus contends that the Closing Resolution does not protect IBM, as an obligor, from any further claim by the primary obligee, BCC, and therefore fails to satisfy California's requirements for a valid assignment. In opposition, Mr. Miller argues that, upon execution of the Amended and Restated Subscription Agreement, IBM became the holder of BCC common stock. According to Mr. Miller, under the Closing Resolution, common shareholders such as IBM are protected under Section B-5. The Court finds this evidence sufficient to create a triable issue of fact as to whether the Closing Resolution unfairly excludes BCC's alleged liabilities to IBM, ETC, or IBM China.

Finally, IBM asserts that Mr. Miller cannot establish that the Closing Resolution effected a valid assignment because there is no evidence that BCC assigned its rights and obligations to him. Rather, IBM proffers that the Closing Resolution stated that "except for the above [covenants and conditions] Miller assumes no liability for [BCC]'s obligations[.]" It argues that BCC cannot avoid liability by assigning its assets to an individual that is effectively a continuation of the old corporation.

Mr. Miller, however, argues that under California law a company may validly assign rights alone to an individual to facilitate winding-up, and cites *Trubowitch v. Riverbank Canning Company*, 30 Cal. 2d 335, 338-40 (Cal. 1947), and *Balfour, Guthrie & Co. v. Hansen*, 227 Cal. App. 2d 173, 186-188 (Cal. Ct. App. 1964), in support of this principle. The Court has reviewed these decisions and agrees with Mr. Miller. The Court therefore rejects IBM's argument that the Closing Resolution did not effect a valid assignment.

2. IBM's Liability for Conduct of its Subsidiaries

Next, IBM contends that it is entitled to summary judgment because Mr. Miller's claims arise out of BCC's business dealings with ETC and IBM China, not IBM, and Mr. Miller has failed to present any basis to hold IBM liable for its subsidiaries' conduct.

a) Alter Ego Theory

First, IBM contends that Mr. Miller cannot hold IBM liable for ETC and IBM China's actions under an alter ego theory. Generally, a parent corporation is not liable for the conduct of its subsidiaries. *See U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). However, a parent may be held liable for its subsidiary's conduct under an alter ego theory of liability. "To demonstrate that the parent [corporation] and subsidiary are 'not really separate entities' and satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a *prima facie* case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist; and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). "The first pong of this test has alternatively been stated as requiring a showing that the parent controls the subsidiary 'to such a degree as to render the latter the mere instrumentality of the former.'" *Id.* (quoting *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995)). Stated another way, the question is whether "sufficient respect was paid to corporate

formalities." *Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.*, 969 F.2d 764, 769 (9th Cir. 1992). In assessing whether the alter ego theory applies, the Court examines: (1) commingling of funds and other assets; (2) holding out by one entity that is liable for the debts of another; (3) identical equitable ownership of the two companies; (4) use of the same offices and employees; (5) use of one company as a mere shell for the other; (6) inadequate capitalization; (7) lack of segregation of corporate records; and (8) identical directors and officers. *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (Cal. Ct. App. 2000).

IBM contends that none of the foregoing factors justifies application of alter ego liability in this case. In support, it proffers Mr. Wu's Declaration. As to the first, second, and sixth factors, IBM submits Mr. Wu's statements that neither ETC or IBM China commingles its assets with IBM's and that both ETC and IBM China are sufficiently capitalized and maintain their own bank accounts, financial accounts, and profits and losses separate from IBM. (Wu Decl. ¶¶9-11.) With respect to the fourth factor, Mr. Wu states that ETC's principal place of business is in Shanghai, China, IBM China's principal place of business is in Beijing, China, and that neither one shares office space with IBM. (*Id*. ¶¶6-8.) He further avers that although some of IBM's employees are former ETC and IBM China employees, the subsidiaries do not share employees with IBM. (*Id*. ¶6.) As to factor five, Mr. Wu avers that, although IBM may occasionally be involved in general policy decisions affecting ETC and IBM China, it is not involved in the day-to-day operation of either entity. (*Id* ¶13.) Responsive to factor eight, Mr. Wu states that ETC and IBM China are managed by their own corporate officers, who are distinguishable from those who manage IBM. (*Id*. ¶8.) Regarding the seventh factor, Mr. Wu avers that ETC and IBM China maintain separate corporate records from IBM. (*Id*. ¶12.) Taken together, IBM asserts that these facts demonstrate that sufficient respect has been paid to corporate formalities, such that alter ego liability should not apply.

Mr. Miller counters that there are three grounds to find that IBM China and ETC are mere instrumentalities of IBM. First, citing to *Unocal*, he contends that a parent may be liable when it uses its subsidiary "as a marketing conduit" and attempts to shield itself from liability based on the subsidiary's activities. 248 F.3d at 926. He argues that, here, "IBM's own employees looked at the subsidiaries as merely marketing conduits, describing the IBM Corporation, not its subsidiaries, as

United States District Court
For the Northern District of California

BCC's 'equipment vendor, service provider, and shareholder,'" and cites a memorandum from Robert Putnam in support. The Court has considered this evidence and finds that Mr. Putnam's isolated comment, without more, is insufficient to show that IBM was using IBM China and ETC to distribute its products in an effort to shield IBM from liability.

Next, Mr. Miller argues that IBM can be held liable because it dictated ETC, IBM China, and WTC's business and general policy decisions by providing unsolicited functional guidance to the heads of each subsidiary, and cites Mr. Putnam's deposition testimony in support. Mr. Miller's argument, however, falls short. Although Mr. Putnam testified that IBM occasionally provided guidance on general policy issues to IBM China, this fact does not establish that IBM and IBM China were indistinguishable corporate entities. Rather, Mr. Putnam's testimony merely provides that IBM as the parent company had some involvement in IBM China and ETC's functions. None of the testimony Mr. Miller cites, however, demonstrates that IBM set anything more than general policies for the subsidiaries. *See Unocal*, 248 F.3d at 928 (finding that the plaintiff's evidence that the parent "is an active parent corporation involved directly in decision-making about its subsidiaries' holdings," insufficient, in light of parent's observance of corporate formalities necessary to maintain corporate separateness, to establish first prong of alter ego test). The Court thus agrees with IBM that this evidence fails to satisfy the first prong.

Third, Mr. Miller contends that "IBM and its subsidiaries share employees to such a degree that, for example, in one instance Mr. Putnam was ostensibly an employee of the IBM Corporation, drafting memorandum on the letterhead of IBM Global Services, for projects under the auspices of IBM China." Mr. Miller also refers the Court to Exhibit G to his Declaration, which he claims contains "documents evidencing the consolidated and integrated nature of the agreements entered into among the various IBM entities engaged in the BCC Portal Project and BCC[.]" The Court has thoroughly reviewed this proffered evidence and finds it unavailing. As IBM points out, the fact that a subsidiary uses part of a parent's trade name is insufficient to show that the parent and subsidiary are not separate entities. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). Moreover, aside from compiling these documents, Mr. Miller fails to explain how they evidence a unity of interest and ownership between IBM and its subsidiaries. As to Mr. Miller's argument that Mr. Putnam worked for both IBM

and IBM China, Mr. Putnam testified that at the time he authored the memorandum, he was acting for IBM China and ETC as part of a continuation of a project until a new local attorney was brought on to assume his responsibilities. (Thompson, Ex. C, Putnam Depo. 169:16-21.) Aside from this instance, Mr. Miller has not provided any other competent evidence to rebut Mr. Wu's statements that IBM did not share employees with either ETC or IBM China.

Considering Mr. Miller's arguments and supporting evidence in its entirety, the Court concludes that he has failed to adduce sufficient evidence supporting his contention that IBM controlled ETC and IBM China to such a degree that they were merely IBM's instrumentalities. The Court therefore finds that Mr. Miller cannot satisfy the first prong of the alter ego analysis.

Under the second prong of the alter ego test, Mr. Miller must demonstrate that he will suffer from an inequitable result if the conduct at issue is treated as that of ETC and IBM China alone. To make this showing, Mr. Miller must identify a right that will be defeated if he is not permitted to pursue his claims against IBM. *See Wady v. Provident Life & Accident Ins. Co.*, 216 F. Supp. 2d 1060, 1070 (C.D. Cal. 2002). IBM argues that Mr. Miller cannot make this showing. Particularly, it argues that Mr. Miller should have sued ETC and IBM China in China, where BCC's contacts with these entities occurred. In response, Mr. Miller argues that the Court's refusal to disregard the separate identities of IBM and its subsidiaries would result in fraud or injustice. Specifically, he contends that "[t]he inequity from the failure to pierce the corporate veil is that Defendant IBM is allowed to erect a Chinese wall, shifting any liability away from the parent company to distant, financially dubious entities throughout communist China and the rest of Asia, where a judgment would be difficult to enforce." (Opp. at 14.) The Court is unpersuaded by Mr. Miller's argument. As the Court previously held, BCC's dealings with IBM China and ETC - both based in China - occurred in China. Thus, the Court finds no inequity in Mr. Miller having to pursue legal remedies against these entities in China. Further, as IBM points out, the Ninth Circuit has recognized that "an inability to collect does not, by itself, constitute an inequitable result." *Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.*, 969 F.2d 764, 769 (9th Cir. 1992).

In sum, the Court finds that Mr. Miller has failed to present competent evidence that there is such unity of interest and ownership between IBM and ETC and IBM China that the separate identities of the entities no longer exist, or that failing to hold IBM responsible for its subsidiaries' actions will result

United States District Court
For the Northern District of California

in fraud or injustice. The Court therefore denies Mr. Miller's request to hold IBM liable for IBM China and ETC's conduct under an alter ego theory.

b) Agency Theory

Next, IBM contends that it cannot be held liable for its subsidiaries' conduct under an agency theory. Generally, "[c]ontrol is the key characteristic of the agent/principal relationship." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 541; *accord Unocal*, 248 F.3d at 928. "Accordingly, if a parent exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent." *Sonora Diamond*, 83 Cal. App. 4th at 541. "The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship." *Id.* at 542 (citations omitted).

Mr. Miller first argues that a reasonable jury could find that the control IBM exercises over its subsidiaries is so pervasive and continual that its subsidiaries may be considered nothing more than IBM's agents. In support, Mr. Miller proffers that IBM dictated broad policy decisions by providing unsolicited functional direction and policy guidelines to the heads of each subsidiary; dictated routine maters of daily operation, such as how each subsidiary could store and dispose of paperwork; and dictated the boilerplate language the subsidiaries could use in their contracts. The Court has considered these facts and the supporting evidence, and finds that they fail to establish that the degree of control IBM exercises over its subsidiaries is such that IBM has disregarded the subsidiaries' independent corporate existence.

Mr. Miller also contends that a reasonable jury could find that the subsidiaries functioned as IBM's agents in Asia by engaging in activities that, but for the subsidiaries' presence, IBM would have had to undertake for itself. In support, Mr. Miller contends that: (1) "[w]henever a problem arose in the

IBM organization, communication across corporate lines was swift and far reaching"; (2) IBM "actively dictated its subsidiaries' business policy"; (3) "IBM has vocally acknowledged its international subsidiaries' operations as crucial to the overall success of Defendant IBM's operations"; and (4) "IBM's subsidiaries, in their capacities as agents of Defendant IBM, were acting within the scope of their authority during the BCC Portal Project[.]" Again, the Court has considered these facts and the supporting evidence and finds them insufficient to establish liability on an agency theory. At best, the evidence demonstrates that IBM communicated with its subsidiaries and set general policy with respect to the Asian market. None of the evidence Mr. Miller cites demonstrates that the subsidiaries carried out functions that, had the subsidiaries not existed, IBM would have carried out itself.

In sum, the Court finds that Mr. Miller has failed to present any competent evidence that IBM exercised such extensive control over ETC or IBM China that these subsidiaries could be described as only a means through which IBM acts, or nothing more than an incorporated department of IBM. The Court therefore rejects Mr. Miller's argument that IBM is liable for ETC or IBM China's conduct under an agency theory.

c) Joint Venture Liability

Mr. Miller also contends that IBM is liable for its subsidiaries' actions under a joint venture liability theory. Under California law, "[a] joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." *April Entr., Inc., v. KTTV*, 147 Cal. App. 3d 805, 819 (Cal. App. 1983). Generally, "[t]here are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise." *Jeld-Wen, Inc. v. Superior Court*, 131 Cal. App. 4th 853, 872 (Cal. Ct. App. 2005) (quoting *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1666 (Cal. Ct. App. 1997)). "Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties." *Nelson v. Abraham*, 29 Cal. 2d 745, 749-50 (Cal. 1947). "[W]here evidence is in dispute the existence or non-existence of a joint venture is a question of fact to be determined by the jury." *April Enter.*, 147 Cal. App. 3d at 820.

Here, Mr. Miller claims that the series of agreements that BCC and the various IBM entities

United States District Court
For the Northern District of California

executed establishes that a joint venture existed. Specifically, Mr. Miller submits that BCC and WTC entered into the Subscription to Corporate Stock Agreement, wherein BCC was to issue $6,098,090 in stock to WTC, and WTC would pay $1,570,000 to BCC and that the remainder of the value would be provided to BCC in the form of professional services as defined in the Statement of Work. Mr. Miller further proffers that BCC, ETC, and IBM-China executed the Services Agreement, pursuant to which WTC was to provide 3,700 man days worth of professional services to BCC, in consideration for $6,098,090 worth of stock issued to WTC. BCC, ETC, and IBM-China then entered into the Statement of Work, which incorporated the Services Agreement. Finally, BCC, IBM, and WTC executed the Amended and Restated Subscription to Corporate Stock Agrement, pursuant to which IBM-WTC assigned to IBM all of its right, title, and interest in the Subscription to Corporate Stock Agreement *ab initio*. Relying on these agreements, Mr. Miller asserts that, "[i]t is preposterous to think that the interrelated nature of these agreements gives rise to anything but the reasonable deduction that Defendant IBM and its subsidiaries engaged in a joint profit sharing enterprise."

IBM counters that Mr. Miller "has merely cobbled together various provisions of the contracts between BCC and ETC and IBM China and given his own glass on them. [Mr. Miller] does not cite any competent evidence - not even his own declaration - that establishes any of the elements of a joint venture." The Court agrees with IBM. While Mr. Miller correctly recites the terms of each of the contracts BCC and the various IBM entities entered into, he fails to specify how these agreements operate to give IBM (along with ETC and IBM China) joint control over the business enterprise; how the agreements establish that IBM will share in the profits and losses or the enterprise; or that IBM had a shared ownership interest in the enterprise. Further, although IBM replaced WTC in the Amended and Restated Subscription to Corporate Stock Agreement, this fact, without more, does not establish the requisite elements of a joint venture. Because Mr. Miller has failed to produce sufficient evidence to at least raise a triable issue of fact with respect to the existence of a joint venture, the Court rejects Mr. Miller's argument that IBM may be held liable under a joint venture theory.

d) Conclusion

In sum, Mr. Miller has failed to present a viable legal theory to hold IBM liable for its subsidiaries' business dealings with BCC. Because Mr. Miller has failed to show that IBM is liable

United States District Court
For the Northern District of California

under an alter ego, agency, or joint liability theory, he cannot proceed on his claims against IBM. The Court therefore **GRANTS** summary judgment on all of Mr. Miller's claims in favor of IBM.

3. Mr. Miller's Claims

Notwithstanding the foregoing conclusion, even presuming that Mr. Miller can establish a valid basis to hold IBM liable for its subsidiaries' conduct, IBM is entitled to summary judgment on Counts one, two, four, six, seven, eight, nine, ten, and eleven.[2]

a) Count Four - Breach of Oral Agreement

In Mr. Miller's fourth claim, he alleges that in August 2000, BCC entered into an oral contract with the defendants for the production and delivery of demonstration computer software and preparation of related documentation to BCC. Pursuant to the terms of the oral agreement, BCC was to pay the defendants $200,000. Mr. Miller alleges that, although BCC made the required payments, the defendants failed to perform.

IBM brings three challenges to this claim. First, IBM argues that, pursuant to California Civil Code section 1625, the Amended and Restated Stock Subscription Agreement, executed on October 2, 2000, superceded any purported oral agreement. Second, IBM argues that any oral agreement fails because there was no valid consideration exchanged. Particularly, it asserts that BCC's payment of $200,000 was to defray part of the amount that BCC owed to ETC, and was not part of any oral agreement. Third, IBM argues that there is no competent evidence that IBM was involved in making the oral agreement.

Mr. Miller has failed to proffer any argument or evidence in response to these challenges. In particular, as IBM points out, Mr. Miller has failed to cite to any record evidence establishing that IBM was a party to the alleged oral agreement, setting forth the terms of the oral agreement, or demonstrating that IBM breached the terms of the agreement. Because Mr. Miller has failed to come forward with sufficient evidence to sustain his claim, the Court **GRANTS** summary judgment on Mr. Miller's breach of oral agreement in favor of IBM.

b) Count Two - Breach of the Services Agreement

---

[2]As detailed below, Mr. Miller voluntarily withdrew count twelve of his Second Amended Complaint for violation of 18 U.S.C. §1030.

United States District Court
For the Northern District of California

In his second claim, Mr. Miller asserts that BCC entered into a written Services Agreement with IBM China and ETC, whereby IBM China and ETC agreed to provide professional services and certain materials to BCC in furtherance of the Subscription Agreement. Specifically, Mr. Miller claims that the Services Agreement required IBM China and ETC to provide custom computer software, system components, design, documentation, and approximately 3700 work days of design and programming services to BCC. In exchange, BCC was to pay $1.7 million in cash, and $1 million in shares pursuant to the terms of the Subscription Agreement. Mr. Miller alleges that BCC timely performed all of its obligations under the Services Agreement, but IBM China and ETC failed to perform the required work and failed to deliver the contracted-for materials to BCC. According to Mr. Miller, when IBM China and ETC delivered the non-conforming server system and materials to BCC in August 2001, they failed to develop the software pursuant to the Services Agreement, removed all of BCC's software that was produced under the Services Agreement, and removed and/or caused physical damage to certain partS of the server system's hardware components, rendering the server system wholly inoperable. Mr. Miller further alleges that BCC assigned its rights in and to the Services Agreement to him on October 31, 2001.

IBM contends that Mr. Miller's claim for breach of the Services Agreement fails because Mr. Miller has no evidence that anyone at BCC asked for ETC's consent to the purported assignment of BCC's rights under the Services Agreement to Mr. Miller, or that ETC gave its consent, as is required by Article 10 of the Services Agreement. Specifically, Article 10 of the Services Agreement provides: "Subject to the right that Seller [ETC] has granted to Buyer [BCC] to sublicense the Materials pursuant to article 7 hereof, Buyer will not assign its rights or delegate its obligations with respect to all or any part of this agreement without the prior consent of the Seller."

In response, Mr. Miller contends that he "testified at a hearing in this matter that he gave oral notice of the intended assignment to Charles Wu during a telephone call, and that Charles Wu did not object upon receipt of notice." (Opp. at 17.) However, as IBM notes, Mr. Miller fails to proffer any citation to the record in support of this assertion. Absent evidentiary support that BCC obtained ETC's

United States District Court
For the Northern District of California

consent to the assignment, Mr. Miller's claim fails.[3] Accordingly, the Court **GRANTS** summary judgment in favor of IBM on Mr. Miller's claim for breach of the Services Agreement.

c) Count Six - Trespass

In count six, Mr. Miller asserts a claim for trespass. He alleges that "the accessing without authorization of a protected computer, server system and programs owned by BCC for the purpose of disabling said server system . . . constituted a trespass by Defendants on [Mr. Miller's] and BCC's property." (SAC ¶87.) Additionally, Mr. Miller alleges that "defendants' trespass on BCC's proprietary, valuable and time sensitive property . . . interfered with [his] and BCC's rights to derive income and/or value therefore, was wrongful and caused severe direct damage to Plaintiffs, including [], expenses incurred by both Plaintiffs for transporting, storing and insuring the valueless Server System." (*Id.* ¶88.)

To prevail on this claim, Mr. Miller must prove: (1) IBM intentionally and without authorization interfered with BCC's possessory interest in its server system; and (2) the unauthorized use proximately resulted in damage to BCC. *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069-70 (N.D. Cal. 2000). "[N]o trespass can be found if actual consent to entry was given." *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 756 (N.D. Cal. 1993).

IBM contends that Mr. Miller cannot prove either element of his trespass claim. As to the first element, IBM contends that IBM China and ETC's use of BCC's server was authorized by the parties' agreements. Mr. Miller counters that the contracts solely authorized IBM China and ETC to access the Server System in the context of building and maintaining it, and that none of the agreements permitted IBM China or ETC to access the Server System for the purpose of disabling it. Thus, he contends that

---

[3]In his Second Amended Complaint, Mr. Miller alleges:

> Notwithstanding such consent, the Subscription Agreement, on which the Services Agreement is conditioned, contains no assignment restriction. Absent specific language in the Services Agreement providing a method for resolving conflicts of language between the agreements, Article 3 of the Statement of Work, [] sets Order of Precedence to the master agreement, which in the case of the Services Agreement and the Subscription Agreement, is the latter, which contains no restrictions regarding assignments. The assignment is therefore enforceable on its face; irrespective of the precedence hierarchy.

(SAC ¶54.) However, he has not presented any argument or evidence in support of this allegation in his Opposition.

United States District Court
For the Northern District of California

IBM China and ETC exceeded the scope of any accessed authorized under the agreements.

Neither party disputes that to build and maintain BCC's Server System, IBM China and ETC needed to access this system. However, as Mr. Miller points out, his claim is premised on IBM China and ETC's acts of accessing the Server System to extract and/or delete software. While IBM contends that it only removed applications that BCC failed to pay for, and therefore lacked any possesory interest in, the key question is whether it had authority to access the Server System for this purpose, either under the terms of the parties' agreements or on some other extra-contractual ground. Although IBM maintains that extraction of the components was justified by BCC's failure to pay for its subsidiaries' services and materials, this issue is in dispute, and therefore cannot support judgment in IBM's favor on this claim.

Alternatively, IBM contends that Mr. Miller cannot prove that ETC and IBM China's use of the system caused any damages to BCC's Server System. The only evidence Mr. Miller has cited in support of his claim are a series of email messages exchanged between him and Mr. Hui, wherein they discuss the removal of the software that ETC developed. (Miller Decl. Ex. D.) In his Second Amended Complaint and in his Opposition, Mr. Miller contends that the removal of this software disabled the system, rendered it valueless, interfered with his and BCC's right to derive income and value from the Server System, and caused BCC to expend unnecessary expenses in transporting, storing, and insuring the Server System. Aside from these allegations, however, Mr. Miller has proffered no evidentiary support for his claim that he and/or BCC incurred damages as a result of IBM China and ETC's alleged trespass. Consequently, the Court **GRANTS** summary judgment in favor of IBM on this claim.

d) Counts One, Seven, Eight, Nine, & Ten - Fraud Claims

In his Second Amended Complaint, Mr. Miller assets five fraud-based claims. In count one, Mr. Miller asserts that Defendants fraudulently misrepresented facts regarding the Server System and Materials contrary to the Stock Subscription Agreement. In count seven, Mr. Miller asserts a claim for fraud in the inducement. He alleges that Defendants made certain promises, assurances, and representations to him and BCC to induce BCC to enter into the various agreements, which were false and misleading. In count eight, Mr. Miller alleges that the defendants fraudulently misrepresented the origin, configuration, functionality, and merchantability of the Server System and Materials, and

negotiated the Amended Stock Subscription Agreement knowing that they had a non-conforming hardware and software. (*Id.* ¶102.) In count nine, Mr. Miller asserts a claim for negligent misrepresentation. He alleges that Defendants were negligent in making the representations regarding the hardware and software and had no reasonable grounds for believing the representations to be true when they made them. In count ten, Mr. Miller asserts a claim for active concealment of known facts. He alleges that Defendants actively concealed or suppressed material facts relating to the agreements; Defendants' ability to fulfill their obligations under the agreements; and regarding defects in the Server System and Materials known to Defendants. (*Id.* ¶113.)

IBM moves for summary judgment on each of Mr. Miller's fraud claims on the ground that he cannot prove essential elements to sustain the claims. As to Mr. Miller's fraud/intentional misrepresentation, fraud in the inducement, and active concealment of known facts claims, IBM argues that Mr. Miller cannot prove that any representative of IBM made any representations to BCC. It further argues that Mr. Miller cannot prove that ETC or IBM China's representatives knew their statements were false or made any statements with the intent to defraud BCC.

As to Mr. Miller's negligent misrepresentation claim, IBM contends that Mr. Miller lacks any evidence that any IBM representative made statements to BCC without reasonable ground for believing them to be true.

In response, Mr. Miller argues as follows:

> Among Defendant IBM's more egregious frauds was to promise BCC that in exchange for $6,098,090 worth of BCC issued stock, Defendant IBM and its subsidiaries would in return provide an equal amount of real value in the form of development support, consulting services, software and hardware, and advertising and promotion. (SAC, Ex. A, Ex. B, Ex. C, Ex. D., Ex. E). Instead, Defendant IBM only delivered unqualified employees for professional services (Thompson Decl., Ex. F, "BCC Project Assessment Executive Summary": "The customer has raised concerns that the [] committed man days stated in the proposal is much higher than actual and yet the billable amount is so high. The reasons [sic] is mainly due to the following: a. Flyin [sic] support which has a much higher billing rate[;] b. Use of BJ resources versus SISC resources (different of billing rate) due to experience and skill requirement[.]"; Thompson Decl., Ex. G, "BCC: Project Assessment Executive Summary": "The biggest exposure of this project is the staffing and the experience level of 00 technical staff. Currently, there are still some uncertainties of the resources assignment . . . [i]mmediate action will be needed to avoid late delivery and customer satisfaction issues.").

United States District Court
For the Northern District of California

> On the basis above, a reasonable jury could find that Plaintiff Miller presented sufficient evidence to prove Defendant IBM intentionally defrauded BCC.

(Opp. at 20.) The Court has considered Mr. Miller's argument and reviewed the evidence he has proffered in support, and finds it insufficient to support his fraud-based claims. As IBM points out, Mr. Miller has failed to cite to any evidence in the record substantiating his allegations that IBM, ETC, or IBM China made representations to BCC regarding the products and services that formed the bases of the parties' agreements, that IBM, ETC, or IBM China knew that they were false, or that they made them with the intent to defraud BCC. Instead, the evidence Mr. Miller has cited merely shows that after the parties began performance under the agreements, IBM's subsidiaries undertook project assessments to evaluate the progress of the hardware and software development. Nothing in this assessment demonstrates that IBM or its subsidiaries knowingly and intentionally made false statements to BCC regarding the products and services. Thus, the Court agrees with IBM that Mr. Miller has failed to adduce sufficient evidence to support his fraud/intentional concealment, fraud in the inducement, and active concealment claims. Further, none of the evidence proffered indicates that IBM, ETC, or IBM China made statements to BCC regarding the contracted-for products and services without reasonable grounds for believing them to be true. Accordingly, Mr. Miller's negligent misrepresentation claim fails, as well. Accordingly, the Court **GRANTS** summary judgment in favor of IBM on counts one, seven, eight, nine, and ten.

e) Count Eleven - Breach of Warranty Claim

In his eleventh claim, Mr. Miller asserts that IBM breached the express and implied warranty of fitness. (SAC ¶22.) He alleges that in the sale of goods that occurred under the written agreement, there was both an express and an implied warranty that the Server System and the Materials purchased would be merchantable, and that BCC's Sever System and Materials would possess certain characteristics fit for the purposes for which which they were specified in the agreements. (*Id.* ¶119.) He claims that IBM breached the express and implied warranties when the Server System and Materials subsequently shipped to BCC failed to meet the performance specifications defined in the BRD and related agreements. (*Id.* ¶122.) He further alleges that the Server System and Materials were never configured or delivered as specified and/or were disabled prior to the delivery to BCC.

United States District Court
For the Northern District of California

IBM contends that Mr. Miller's warranty claims fail for three reasons. First, it argues that the only agreement that IBM signed was the Amended and Restated Subscription Agreement. According to IBM, this agreement did not involve the sale of goods, but only involved the sale of BCC common stock, which under the Uniform Commercial Code is an investment security. *See* Cal. Com. Code § 8101. Next, IBM argues that the Court need not decide whether the goods delivered to BCC were fit for their particular purpose because ETC and IBM China were not obligated to deliver any goods to BCC because BCC never tendered payment for those goods. The Court, however, is unpersuaded by this argument. As indicated above, a question of fact exists as to whether BCC was is arrears on its payments to IBM China and/or ETC. Thus, this argument cannot support summary judgment in favor of IBM. Third, IBM asserts that nothing in any of the agreements obligated ETC or IBM China to deliver any goods. Rather, IBM contends that the agreements merely obligated them to perform engineering services, with no warranty for any given result or product.

Mr. Miller does not respond to any of these arguments. Rather, he contends that the basis for IBM's liability stems from BCC's purchase of hardware necessary for the Server System from IBM's business partner and shipping agent, Golden Horse Networking Technology (HK). According to Mr. Miller, "BCC purchased the hardware for the BCC Server System through an IBM business partner, Golden Horse, and accordingly, under the IBM Customer Agreement, Defendant IBM is responsible for the accompanying warranties." (Opp. at 21.) Mr. Miller's argument, however, is unavailing. As IBM correctly notes, the only agreement that IBM was a party to was the Amended and Restated Stock Subscription Agreement, which concerned the transfer of BCC stock. Mr. Miller has not presented any colorable evidence demonstrating that by signing the Amended and Restated Stock Subscription Agreement, IBM became a party to any of the other agreements, or otherwise warrantied products from other entities, such as Golden Horse. Further, Mr. Miller has not proffered any explanation and supporting evidence regarding what was nonconforming about the hardware BCC received from Golden Horse. Having failed to present sufficient evidence establish a basis to hold IBM liable for the Golden Horse products and to establish that the Golden Horse products were non-conforming, Mr. Miller cannot sustain his breach of warranty claim against IBM. Accordingly, the Court **GRANTS** summary judgment on Mr. Miller's breach of warranty claim.

United States District Court
For the Northern District of California

f) Count Twelve - Violation of Federal Computer Fraud and Abuse Act

In count twelve, Mr. Miller asserts a claim for violation of the federal Computer Fraud Abuse Act, 18 U.S.C. § 1030. He alleges that Defendants "voluntarily and deliberately accessed an electronic banking and financial transaction computer belonging to BCC (hereinafter "protected Computer") and caused the unauthorized interstate and/or foreign transmission of a program, information, code or command [directed] to damage the Protected Computer, and as a result of that conduct, intentionally caused such damage in violation of 18 U.S.C. Section 1030(a), *et seq*." (SAC ¶126.) At oral argument on IBM's Motion, Mr. Miller voluntarily withdrew this claim.

C. Mr. Miller's Request for Additional Discovery Pursuant to Rule 56(f)

In his Opposition, Mr. Miller urges the Court to deny IBM's Motion and allow him additional an opportunity to conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(f). Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Thus, Rule 56(f) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Litsap Physicians Service*, 314 F.3d 995, 1000 (9th Cir. 2002). As Rule 56(f) indicates, if the affidavit demonstrates that a continuance is needed to obtain facts essential to preclude summary judgment, then the court should continue the summary judgment motion. *State of Calif. v. Campbell*, 138 F.3d 772, 779 99th Cir. 1998). However, if the party seeking the continuance pursuant to Rule 56(f) failed "to conduct discovery diligently," the court may deny the request. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002). Further, when a party requests a Rule 56(f) continuance after the discovery deadline set forth in the Rule 16 Scheduling Order, the party must also demonstrate "good cause" exists under Rule 16(b) to conduct further discovery. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992). "Rule 16(b)'s 'good cause' requirement, like that for Rule 56(f) relief, considers the diligence of the party seeking relief." *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1030 (E.D. Cal. 2002).

In support of his Rule 56(f) request, Mr. Miller contends that "[t]here has been no discovery

United States District Court
For the Northern District of California

allowed as to Defendant's subsidiaries [] and no authentication of Mr. Wu's documents, under [P]laintiff's Request for Admissions[]." (Opp. at 23.) Mr. Miller also contends that he "has not been allowed to depose Charles Wu[], and as Defendant IBM bases its motion on the [D]eclaration of an individual whom Plaintiff Miller cannot cross examine, Defendant IBM's [M]otion for summary judgment should be denied." (*Id.*)

IBM opposes Mr. Miller's request, arguing that fact discovery in this matter closed on November 18, 2005, and Mr. Miller had ample time to obtain the information necessary to prosecute his case during discovery. Further, IBM argues that Mr. Miller could have sought information relating to the subsidiaries in when deposing Mr. Putnam, who IBM designated as it's Rule 30(b)(6) witness. The Court agrees with IBM. Mr. Miller has failed to articulate what specific facts would be revealed by further discovery and how those facts would preclude summary judgment, as required by Rule 56(f). Further, Mr. Miller has not proffered any explanation as to why he was unable to obtain the evidence he now seeks during the normal discovery period. The Court therefore **DENIES** his request under Rule 56(f).

IV. Conclusion

For the foregoing reasons, the Court **GRANTS** IBM's Motion for Summary Judgment. Further, the Court **DENIES** Plaintiff's Rule 56(f) request for leave to take additional discovery. All other pending motions in this case are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: 9/26/2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE